In re **LACKAWANNA & WYOMING VALLEY R. CO.**

No. 10621.

United States District Court
M. D. Pennsylvania.

Sept. 25, 1950.

◆

The following is the opinion of Levy, Special Master:

The instant matter comes up on the filing of an application by E. McLain Watters, Trustee of the Lackawanna and Wyoming Valley Railroad Company, debtor, (hereinafter called "Trustee") praying for authority to enter into a written agreement with the Pompey Coal Company (hereinafter called Pompey) and the Erie Railroad Company (hereinafter called Erie) under the terms of which certain coal refuse is to be sold to the Pompey Coal Company for the price of 81¢ per ton. The petition avers that included among the assets of the debtor is a certain leased property known as the No. 6 Branch. This property is under a lease to the debtor from Erie. It however was abandoned by the debtor many years ago. Situate on the roadbed of the leased property are indeterminate quantities of coal refuse and culm fill of no benefit to the debtor in the operation of the Railroad. Various offers have been received by the debtor from coal operators to purchase the coal refuse. Erie has asserted a claim of ownership to this property and has refused to permit sale of the coal except upon terms approved by it. Erie wants to sell the refuse to Pompey and the debtor has agreed to the sale and to a division of the proceeds between Erie and the debtor. A contract for the sale of the coal refuse has been executed subject to approval by the Court.

Hearing was held on September 18, 1950, in the United States Court House at Scran-

ton, Pennsylvania, to consider the above petition. Testimony was heard from E. McLain Watters, Trustee of the Debtor, Robert H. Boykin, Superintendent of the Jefferson and Wyoming Division of the Erie Railroad Company. Several coal operators were present or represented by Counsel and letters from them were incorporated in the record of the proceedings.

An affidavit of service of the Master's Order fixing the time and place and purpose of the hearing was filed and showed service thereof upon the Guaranty Trust Company of New York and the Pennsylvania Company for Banking and Trusts, Philadelphia, Pa., Norris, Bell, Lex, Hart and Eldredge, Philadelphia, Pa., Attorneys for 1st Mortgage Protective Bondholders Committee, Nemerov & Shapiro, Attorneys for the Schallitz Bondholders Committee, Paul Simon, Esq., of New York City, A. Albert Minton, Esq., of New York City, and Geist E. Netter, Esq., Attorney for Debenture Bondholders Committee. Affidavits of the publication of notice in the Scranton Tribune, Scranton, Pa., Scranton Times, Scranton, Pa., and the Lackawanna Jurist, Scranton, Pa., were also filed.

Appearances were entered by E. McLain Watters, Jr., Esq., and Norman Harris, Esq., counsel for the Trustee; Walter W. Harris, Esq., counsel for the Guaranty Trust Company of New York; Ellis Berger, Esq., counsel for the Meadowside Coal Company, and Charles Volpe for the Gateway Coal Company.

The testimony supports the material factual averments of the petition, and from the testimony the Master makes the following

### Findings of Fact.

1. E. McLain Watters is Trustee in Reorganization of the property of the Lackawanna and Wyoming Valley Railroad Company, Debtor, in the foregoing proceedings for the Reorganization of the Railroad. Mr. Watters was appointed by order of Court dated July 18, 1949. The appointment was approved by the Interstate Commerce Commission shortly prior to December 1, 1949, and Mr. Watters qualified and has been acting as Trustee since December 1, 1949.

2. Included among the assets of the debtor is a leased property known as the No. 6 Branch. This property formerly very well known as the Old Gravity Railroad had on it the roadbed which was made up of culm and coal and was leased on October 27, 1903 by the Erie and Wyoming Valley Railroad Company (now known as the Erie Railroad Company) to the debtor for a term of over 900 years.

3. The property so leased originally consisted of the railroad line together with roadbed and property contiguous thereto.

4. The No. 6 Branch has been abandoned by the debtor pursuant to permission from the Pennsylvania Public Utilities Commission and Interstate Commerce Commission for a period of approximately 12 years. The tracks formerly situated thereon have been removed and the property "was abandoned because it was unprofitable."

5. There is situate on the roadbed certain material consisting of coal refuse or culm fill used originally as ballast for the roadbed of no use to the debtor but suitable for sale to operating coal companies.

6. Erie has asserted ownership in the coal refuse situated on the roadbed, and has refused to permit sale of the property except upon terms and conditions approved by it.

7. Various offers for the purchase of this coal refuse have been submitted to the debtor, all of which have been considered by the debtor and by Erie.

8. By instrument dated September 15, 1950, Erie and the Trustee jointly entered into an agreement with Pompey for the sale of the refuse now in place on the roadbed at a price of 81¢ per ton, 70% thereof to be paid to the debtor and 30% to be paid to Erie.

9. By the terms of the contract of sale Pompey agrees

(a) to carry all of the coal refuse removed to an Erie siding and to a preparation plant on the Erie and to ship all of the refuse over the lines of the Erie;

(b) All holes created by the mining will be filled in and leveled off by Pompey and all reasonable precaution will be taken by Pompey to make a safe aftermath of the removal;

(c) to carry sufficient liability insurance within minimum limits of $50,000 to $100,000 covering claims for personal and property damage and workmen's compensation claims for injuries of any nature on the premises;

(d) to indemnify the debtor and Erie from any and all liability by reason of injuries or damages to any person or property on the premises;

(e) to remove a minimum of 6,000 tons of coal refuse during each and every month of the agreement, and agrees that the agreement shall terminate if Pompey fails to take the minimum of 6,000 tons per month or should violate any of the covenants of the agreement, make an assignment for the benefit of creditors, or becomes subject to bankruptcy, receivership or execution proceedings.

10. All of the terms of the agreement are set forth in the tentative contract marked "Petitioner's Exhibit No. 2" and filed with the record of these proceedings.

11. On September 11, 1950, the Meadowside Coal Company submitted to Norman Harris, Esq., of counsel for the Trustee, an offer to purchase the coal refuse at a price of 90¢ per ton.

12. On September 18, 1950, the date of the hearing, an offer was received by the Special Master from the Gateway Coal Company offering to purchase the coal refuse at the price of 91¢ per ton.

13. On September 19, 1950 by Registered Letter to the Special Master the Meadowside Coal Company increased its offer to $1 per ton and agreed to comply with all the terms and conditions of the Petition if the offer is accepted.

14. The offers referred to in Paragraphs 11 and 12 hereof were rejected by R. H. Boykin, the duly authorized representative of Erie, for the reason that the shipping, weighing and operating facilities of the Meadowside Coal Company were insufficient, costly and unsatisfactory to the Erie; that acceptance of Meadowside's offer would involve additional trucking of the coal refuse and weighing at extra cost to Erie of 15¢ per ton; and that the Gateway Coal Company did not possess breaker facilities.

15. Counsel for the Guaranty Trust Company of New York, the first mortgagee, does not oppose the sale nor the approval of the petition or the agreement, but asks the Special Master to reserve for future determination the question as to whether or not the proceeds are subject to the lien of the first mortgage.

### Discussion.

The operation of a railroad during the pendency of Section 77 reorganization proceedings requires that the Trustee of the debtor be entrusted with certain powers enabling him to carry out effectively the routine management of the road.

Those matters involving solely business judgment are deemed to be within the discretionary domain of the Trustee, and while his actions in this respect are subjected to judicial intervention in cases where abuses and absence of good faith may be shown to exist, it is not the duty of the reorganization court to supervise actively the day to day operation of the business of the debtor; such matters are plainly the task of and within the scope of the authority of the Trustee.

"A receiver empowered with authority to operate a business, * * * must be clothed with considerable discretion. He may do such things in the ordinary course of business as to him, in good faith, seem necessary to render the business profitable and successful." 44 Am.Jur. Receivers 229.

Presently before this tribunal is a petition to sell coal refuse situated on a roadbed leased by the Debtor. To effectuate this purpose the Trustee has entered into a proposed contract (the entire terms of which are set forth in the agreement marked "Petitioner's Exhibit No. 2") with Erie the lessor of the roadbed, and with the prospective purchaser of the coal, Pompey, for the sale of such amounts of coal refuse as may be there in place at the price of 81¢ per

ton, 70% of which will be paid to the debtor and 30% of which will be paid to the lessor.

That the Trustee has power to sell the coal refuse is made clear by the provisions of Sec. 77 sub. *o*: "The trustee * * * from time to time, shall determine * * * what * * * property of the debtor, if any, should be abandoned or sold during the pendency of the proceedings in the interests of the debtor's estate and of ultimate reorganization but without unduly or adversely affecting the public interest, and shall present to the judge petitions, in which other parties in interest may join, for authority to abandon or to sell any such property; * * *."

Whether the consummation of the foregoing contract be treated as a problem raising questions solely of business judgment or whether it be deemed a matter requiring express judicial approval of the detailed provisions of the agreement is here immaterial, since an examination of the testimony reveals that the Trustee's actions in entering into the contract upon the terms and conditions therein set forth represent an exercise of sound, practical and well considered judgment under the circumstances.

█ No objections were raised, either by any of the parties to the proceedings or participants in the hearings relating to the propriety and necessity for the sale of the coal refuse. It is plainly apparent that paramount among the pressing problems faced by the Trustee is the constant need for an ample supply of working capital. To this end, every opportunity of supplementing current revenues must be availed of, and the sale of coal refuse located on an abandoned roadbed represents an obvious and desirable method of furthering this objective.

There remains for consideration a discussion of what we deem to be the sole question raised at the hearing, and that is the choice of the purchaser for the coal refuse. The objections which were asserted were interposed not by representatives of any of the various bondholders, whose interests it is the prime duty of the Trustee to protect, but by two bidders in no way parties to the reorganization proceedings. It was contended on behalf of these parties that their offers were higher than that of Pompey and, therefore, that they should have been accepted by the Trustee.

An examination of the record indicates that the choice of Pompey was the most advantageous to the interests of Erie without which the Trustee is immobilized.

Before this tribunal is not the simple question of the sale of property owned solely and completely by the Debtor. Were this the case, public sale to the highest bidder would be the manner of disposition recommended. The testimony reveals that title to the coal refuse sought to be sold is seriously in doubt, it being subject to a vigorous adverse claim of ownership asserted by Erie. This latter company bases its claim of title upon the terms of its lease with the debtor. It additionally appears that the branch line has been abandoned pursuant to permission from the Pennsylvania Public Utilities Commission and the Interstate Commerce Commission. Cars have not been operating on the line for many years and the tracks thereon have been removed. For these reasons Erie refused to consent to any sale of the coal refuse unless the express approval of Erie was obtained and unless its claim of ownership was recognized, by payment to it of a portion of the proceeds. It must be emphasized that Erie is in no way a party to the reorganization nor in any manner presently subject to the jurisdiction of this Court. Its claim to the coal refuse is not merely that of a mortgagee to a lien, but that of an *owner* to *title*. Furthermore, the entire question is greatly complicated by the fact that the branch line has been abandoned by the debtor railroad which factor raises substantial questions respecting the relative rights in the property of the lessor and lessee. While the line of Pennsylvania cases on this subject is long and technical and while Erie's claim may have great validity, it is eminently clear that this problem is not properly before us. Adjudication of title to the coal refuse is beyond the province of the Special Master in this proceeding and would require the institution of a separate and distinct cause of

action. The Trustee cognizant of these facts in attempting to carry out the sale of the coal refuse was confronted with practical problems of the highest difficulty. Litigation of the Erie's claim would involve expensive and protracted proceedings without any assurance of a successful outcome. On the other hand, indefinite postponement of the sale and the consequent realization of cash for the debtor company was a definite certainty. Faced with these alternatives, it is the opinion of the Special Master that the Trustee pursued a sound and sensible course of action: entrance into negotiations with Erie for a compromise of the conflicting claims of ownership, procurement of a purchaser satisfactory to Erie and for a division of proceeds at the rate of 70% thereof for the debtor and 30% to Erie. It appears from the testimony that for a period of many months prior to the execution of the contract prospective purchasers were given ample opportunity to submit bids for the coal refuse. The testimony reveals that Pompey was chosen by duly authorized representatives of Erie for the following reasons:

(1) Its shipping facilities were conveniently located with respect to the lines of the Erie Railroad;

(2) It possessed scale facilities of its own for the separate weighing of the processed coal;

(3) It is a substantial customer of Erie;

(4) The price of 81¢ per ton was satisfactory; as of the date of the filing of the petition this was the highest offer yet received.

Subsequent to the date of execution of the contract bids were submitted by the Meadowside Coal Company on September 11, 1950, to counsel for the trustee to purchase the coal refuse at a price of 90¢ per ton, and after the hearing to $1 per ton, and by the Gateway Coal Company to the Special Master on September 18, 1950, at a price of 91¢ per ton. The statements of R. H. Boykin reveal that the offers discussed at the hearing were rejected by Erie on the grounds that these latter companies possessed inadequate breakers and operational facilities for the coal; that their shipping facilities were inconveniently located requiring costly rerouting by Erie, and that Erie would be forced to weigh the processed coal at the additional expense to it of 15¢ per ton. This uncontradicted testimony makes it clear that while the offers of the other coal companies seemingly appear higher on their face than that of Pompey, they fail to take into account the above mentioned additional expenses which Erie would be forced to incur. When these are considered in the total calculation on their real value in dollars and cents becomes considerably lower than the offer of Pompey. For these reasons the action of Erie in rejecting them are perfectly understandable. It is unnecessary to examine further the reasons of Erie for the rejection of these offers. It is sufficient to note the fact of their rejection, and that for the trustee to attempt to procure acceptance of either one of them would entail further indefinite delay and possible withdrawal of the agreement to divide the proceeds on the generous basis previously agreed upon. Under these circumstances, the action of the Trustee in entering into the prospective contract appears eminently proper as well as satisfactorily profitable to the debtor company. In other words it appears like a good business deal for the Debtor.

Finally the first mortgagees by their counsel stated that it had no objections either to the approval of the petition or to the contemplated sale. It is the opinion of the Special Master that the absence of objection on the part of those who are the real parties in interest to these proceedings is a substantial if not a compelling ground of and by itself for the approval of the Petition of the Trustee.

It is unnecessary to decide at this time the question of whether or not the proceeds of the sale of the refuse will be subject to the lien of the first mortgage. Section 77, sub. o provides: " * * * The judge may order and decree any sale of property, whether or not incident to an abandonment, under this subsection at public or private sale and subject to or free from liens. The proceeds derived from any such sales shall be received by the trustee * * * subject, in case the property was sold free from

lien, to any liens thereon at the time of sale, and shall be applied or disposed of in such manner as the *judge by further order shall direct.*" (Emphasis supplied.)

The Special Master makes the following Recommendations.

1. That in the interests of the debtor and of the creditor-interests permission to execute the requested contract be granted in the manner and form as set forth in the agreement of sale.

2. That the proceeds of the sale become a part of the debtor's estate to be administered in accordance with the applicable provisions of Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205.

Norman Harris, E. McLain Watters, Jr., and Nogi, O'Malley & Harris, all of Scranton, Pa., for E. M. Watters, trustee.

Walter W. Harris, and O'Malley, Harris, Harris & Warren, all of Scranton, Pa., for Guaranty Trust Co. of New York.

Ellis Berger, Scranton, Pa., for Meadowside Coal Co.

Charles J. Bufalino, Pittston, Pa., for Gateway Coal Co.

Walter L. Hill, Jr., O'Malley, Harris, Harris & Warren, all of Scranton, Pa., for Erie R. Co.

Norris, Bell, Lex & Eldredge, Philadelphia, Pa., for First Mortgage Protective Bondholders Committee.

Nemerov & Shapiro, New York City, for Schallitz Bondholders Committee.

Paul Simon, New York City, for individual bondholders.

A. Albert Minton and Geist E. Netter, New York City, for Debenture Bondholders Committee.

WATSON, Chief Judge.

J. Julius Levy, Esquire, one of the Special Masters for the Third Circuit in railroad reorganization proceedings, has filed his Report and Recommendations on a Petition by E. McLain Watters, Trustee of the Lackawanna and Wyoming Valley Railroad Company, Debtor, (hereinafter called "Trustee") for permission to sell coal refuse to the Pompey Coal Company, (hereinafter called "Pompey") for the consideration and on the terms and conditions set forth in the Petition and in an agreement dated September 15, 1950, between the Erie Railroad Company (hereinafter called "Erie") and the Trustee jointly with Pompey.

The Report and Recommendations of the Special Master are so able, clear and complete that there is little if anything left for the Court so say or do other than to adopt them in full as the Opinion, Findings and Conclusions of the Court.

It is clear that title to the coal in the Lackawanna and Wyoming Valley Railroad Company, Debtor, is seriously in doubt, that the claim of title to the coal refuse by the Erie is substantial and that under all the circumstances, the action of the Trustee in entering into the agreement dated September 15, 1950, jointly with the Erie with Pompey, was proper and profitable to the Debtor Company. It is also clear that under all the facts and circumstances shown to exist, the offers of other coal companies are actually lower in dollars and cents than that of Pompey, and that the action of the Trustee in entering into the prospective contract was eminently proper as well as satisfactorily profitable to the Debtor Company as shown by the Special Master's Report.

Now, September 25, 1950, the Special Master's Opinion is adopted as the Opinion of this Court: The Findings of Fact and Conclusions of the Special Master are adopted as the Findings of Fact and Conclusions of the Court, the Recommendations of the Special Master are adopted, and it is ordered that the Trustee be, and he hereby is, permitted to execute the requested contract in the manner and form as set forth in the agreement of sale. The proceeds of the sale to the Debtor shall become a part of the Debtor's estate and be administered in accordance with the applicable provisions of Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205.